UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER BEHREND,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SAN FRANCISCO ZEN CENTER, INC., et al.,<br><br>　　　　　Defendants. | Case No. 21-cv-01905-JSC<br><br>**ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 63 |

Alexander Behrend sues his former employer, the San Francisco Zen Center, for discrimination on the basis of his disabilities.[1] Before the Court is SF Zen Center's motion for summary judgment on its affirmative defense, the ministerial exception. (Dkt. No. 63.)[2] Having carefully considered the briefing, and with the benefit of oral argument on February 2, 2023, the Court GRANTS the motion. SF Zen Center has established as a matter of undisputed fact that Mr. Behrend's work was part of a religious practice program and implicates the organization's "power to decide for [itself], free from state interference, matters of church government[,] . . . faith and doctrine." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 186 (2012) (cleaned up).

**FACTUAL BACKGROUND**

**A. SF Zen Center**

San Francisco Zen Center is the largest Soto Zen Buddhist church in North America. (Dkt. No. 64-2 ¶ 6; *see* Dkt. No. 64-28.) It consists of three temples: City Center, Tassajara Mountain

---

[1] Mr. Behrend has agreed to dismiss the other Defendants. (Dkt. No. 67 at 4 n.1.)
[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

Center, and Green Gulch Farm. (Dkt. No. 64-2 ¶ 8.) SF Zen Center "is a religious training institution, and offers several different types of programs for individuals interested in learning about and training in Zen Buddhism." (*Id.* ¶ 10.) While some programs are offered to the general public, it reserves others for those who live full-time at a temple through three residential programs, each of which requires having participated in the preceding program: guest student (2-6 week residency), Work Practice Apprentice (2-3 year residency), and Staff. (*Id.* ¶¶ 10, 14–16; *see* Dkt. No. 64-12 (Work Practice Apprentice policies).) SF Zen Center "is a Soto Zen residential training center, and all residents are admitted and supported to be in residency with this primary purpose in mind." (Dkt. No. 64-9 at 2.) All residents agree to follow the Shingi (Pure Standards or Guidelines for Conduct) and the Residents' Handbook. (Dkt. No. 64-2 ¶¶ 11, 13; Dkt. No. 64-7 at 13; *see* Dkt. Nos. 64-9, 64-11.)

All residents participate in both "formal practice" and "work practice." (Dkt. No. 64-2 ¶¶ 11–12.) Formal practice includes morning and evening zazen meditations and services, soji (temple cleaning), dharma talks, classes, and events including monthly full moon ceremonies, one-day sit meditations, and three- to five-day sesshin meditations. (Dkt. No. 64-9 at 5–6; Dkt. No. 64-10 at 2; *see* Dkt. No. 64-6 at 13; Dkt. No. 64-7 at 8–9, 15–16; Dkt. No. 67-7 at 50, 52.)

Work practice includes cooking, dishwashing, bathroom cleaning, preparing guest rooms, and doan ryo ceremonial tasks "which support the formal practice, such as ringing bells, cleaning altars, [and] watching the door during zazen [meditations]." (Dkt. No. 64-9 at 5–7.) Work practice is an "essential" and "indivisible" part of Zen training. (Dkt. No. 64-2 ¶ 12; Dkt. No. 64-12 at 4.) According to a document written by a SF Zen Center practitioner "about the importance of work practice in the practice of Zen Buddhism," (Dkt. No. 64-2 ¶ 12):

> When work is practice it is seen as part of our zazen (meditation) practice itself. It is an end in itself. Work and zazen go hand in hand. Both are necessary and without one, the other suffers. When work is practice, it is a Buddha doing what a Buddha does, how a Buddha does it.
>
> . . . "Zen Mind" is a willingness to engage ourselves wholeheartedly in whatever we are doing in the present moment, whether it is making up a bed, cleaning a toilet, chopping a carrot, or serving a guest in the dining room. . . . When we bring our zazen practice into our work, we take a leap out of that conditioned small mind and into the freedom

> and generosity of the mind that is accepting, fresh, and full of possibility.
>
> . . . Silence supports our practice of full engagement and mindfulness. At first, this silence may feel uncomfortable. And just like in zazen, when you notice the mind wandering off into fantasy, criticism, the urge to chat, or any other distraction, you gently but firmly bring it back to the breath, the body, and the task at hand.

(Dkt. No. 64-10 at 2–3; *see also* Dkt. No. 64-4 at 8 ("It's a meditation in the kitchen as well as in the Zendo [temple]. The only difference is people are sitting still in the Zendo, and they're doing work practice in the kitchen."); Dkt. No. 64-6 at 7 ("[T]he way that [SF] Zen Center approaches work practice is . . . to develop this idea of beginner's mind. . . . [W]e try to . . . have people look at discomfort, look at work as a—an element of their practice and look at how their mind is working while they're practicing . . . ."); Dkt. No. 64-9 at 7 ("Enter wholeheartedly into the work that has been assigned. Maintain silence as much as possible at work.").) In particular, for Work Practice Apprentices:

> [Work Practice Apprentice] positions at [SF Zen Center] are part of the religious training. Communal work practice is an integral and indivisible part of the Zen training and spiritual practice offered at [SF Zen Center]. The terms "work practice" and "work" as used in these guidelines incorporate these fundamental principles.
>
> . . . [SF] Zen Center is primarily a Zen training temple and therefore work practice positions are temporary training positions. Work practice positions have a specific term and are rotated.

(Dkt. No. 64-12 at 4, 10.)

The Pure Standards (Guidelines for Conduct) for Residential Zen Training disclose that "Residents are asked to attend 100% of the formal practice schedule," and "[a]ny month in which a resident's attendance falls below 80% is a matter of high concern." (Dkt. No. 64-9 at 3.) Further, "[a] consistent pattern over an extended period of time of less than 80% attendance of the formal schedule, and/or a lack of fulfillment of other communal and work practice responsibilities . . . may be cause for the Practice Committee to consider whether a student is thriving and/or able to make a residential practice at City Center a priority." (*Id.*)

There are three levels of ordination in Soto Zen Buddhism at SF Zen Center: lay, priest, and teacher ordination. (*See* Dkt. No. 64-7 at 10 ("I, myself, am a Zen priest and I have been ordained and I have students, but I am not actually officially a teacher. Because that is another

3

ordination usually ten or twenty years down the road where you become an official, quote-unquote, 'teacher' and you can ordain teachers."); Dkt. No. 67-7 at 24–25, 27–29.) Becoming lay ordained, a priest, or a teacher has a unique timeline for each practitioner. (Dkt. No. 64-7 at 10–12, 21–22.) For example, one SF Zen Center resident of 21 years is lay ordained; one former resident of 10 years is a priest with plans to ordain as a teacher; and another resident was lay ordained for three years before becoming priest ordained. (*Id.* at 12.) The processes are non-linear and non-Western. (*Id.* at 11, 20–21.)

### B. Mr. Behrend and SF Zen Center

Mr. Behrend learned about SF Zen Center by searching online for volunteer opportunities. (Dkt. No. 67-3 ¶ 2.) In May 2014, Mr. Behrend had suffered serious injuries from a car accident and been diagnosed with post-traumatic stress disorder ("PTSD"). (*Id.* ¶ 1.) That summer, he volunteered a few times with SF Zen Center's food outreach program as a way to take his mind off the car accident. (*Id.* ¶ 2.) He was not interested in adopting a new religion and did not think SF Zen Center was a religious organization. (*Id.*) Since the accident, Mr. Behrend has not been able to return to the high-performance industry in which he built a career, which in turn has made it difficult to afford stable housing. (*Id.* ¶ 1.)

In fall 2015, Mr. Behrend resumed volunteering with SF Zen Center's food outreach program. (*Id.* ¶ 3.) He became more involved by attending meditations one to three times a week and participating in the Saturday sangha, a group of non-residents who assisted by watching the door, guiding visitors through the building, cooking lunch, cleaning up, and listening to a dharma talk. (*Id.* ¶¶ 3–4.) At this time, Mr. Behrend "knew that Buddhism was a type of religion and viewed these dharma talks as a type of sermon." (*Id.* ¶ 4.) In 2016, Mr. Behrend continued attending SF Zen Center programs as a non-resident. He also participated in a "practice period" lasting several months, which involved weekly book discussions, monthly one-day sits, and a three-day sesshin. (*Id.* ¶ 6.)

In summer or fall 2016, Mr. Behrend was given one month's notice of losing his housing. (*Id.* ¶ 9.) He spoke with David Zimmerman, SF Zen Center's head of practice, who encouraged him to apply for a residential program. Mr. Behrend was "eager to have housing and

4

employment," had met friendly and supportive residents, and appreciated how meditation and the physical, repetitive work he did at SF Zen Center helped him manage his PTSD symptoms. (*Id.* ¶¶ 8–9.) He applied to be a guest student and began in November 2016. (*Id.* ¶ 10.) As a guest student, he attended morning meditation, worked from 9:00 a.m. to midday, ate lunch with other residents, worked from 1:30 to 3:30 p.m., and attended evening meditation. He also attended dharma talks twice a week and met with the work leader once a week.

Mr. Behrend applied to be a Work Practice Apprentice and began in January 2017. (*Id.* ¶ 11.) By then, he considered himself "a practicing Zen Buddhist, but was not interested in becoming an ordained priest." (*Id.*) As a Work Practice Apprentice, he kept a similar schedule to a guest student, and received room, board, and a stipend. (*Id.* ¶ 12; *see* Dkt. No. 64-12 at 6, 10.) His first work practice assignment was guest services (shika crew), where his duties included "checking guests into the lodging that [SF Zen Center] offered to paying customers, handling and processing payments, preparing guest rooms, preparing conference rooms and event spaces for organizations that rented the space, cleaning and folding laundry, answering guest's questions, and revising and expanding a concierge packet." (Dkt. No. 67-3 ¶ 13.) "Each morning before work began, members of the guest services crew would spend five minutes . . . bowing in front of a small figurine of Buddha," "sprinkling flowers," and "read[ing] a few paragraphs from a book about Buddhism." (*Id.*) Mr. Behrend was later assigned to the kitchen (tenzen crew), where he cooked and washed dishes. (*Id.* ¶ 14.) "Each morning . . . , we would bow to an altar in the kitchen and recite out of the Tenzo Kyokun ('Instructions for the Cook'), for 5-10 minutes before starting work." (*Id.*)

In September 2018, SF Zen Center told Mr. Behrend he would be reassigned to the maintenance crew. (*Id.* ¶ 24.) He "briefly worked on the maintenance crew, but this work exacerbated [his] PTSD symptoms, and [he] sought employment on another work crew, which was denied." (*Id.*) Mr. Behrend alleges SF Zen Center's course of dealing after September 2018, including demanding he move out in January 2019, was disability discrimination in violation of the Americans with Disabilities Act and the Rehabilitation Act. (Dkt. No. 1 at 4–5.) He alleges disparate treatment, failure to engage in the interactive process, failure to provide reasonable

accommodation, retaliation, and termination.  (*Id.* at 2.)  Mr. Behrend eventually left residency in August or September 2019.  (Dkt. No. 67-3 ¶ 25.)

**PROCEDURAL HISTORY**

Mr. Behrend, without representation by counsel, filed this action after he left SF Zen Center.  The Court referred him to the Northern District of California Legal Help Desk for possible appointment of counsel, and pro bono counsel was located and appeared on his behalf.  Following a case management conference, the Court ordered SF Zen Center to file a summary judgment motion on its First Amendment Religion Clauses affirmative defense following discovery on this issue.  It did so, and the Court heard oral argument on the motion on February 2, 2023.

**DISCUSSION**

**I.    Legal Standard**

The Constitution's "Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) (cleaned up).  "State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion.  The First Amendment outlaws such intrusion." *Id.*

Matters of church governance are closely linked to the independence of religious institutions in matters of "faith and doctrine." *Id.* (cleaned up).  This linkage means the Religion Clauses protect a religious institution's "autonomy with respect to internal management decisions that are essential to the institution's central mission.  And a component of this autonomy is the selection of the individuals who play certain key roles." *Id.*  What is known as the "ministerial exception" to employment discrimination laws arises from these principles.  "Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Id.*  A religious institution's "independence on matters of faith and doctrine requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." *Id.* (cleaned up).

6

"In determining whether a particular position" falls within the ministerial exception, "a variety of factors may be important." *Id.* at 2063. In *Hosanna-Tabor*, the plaintiff-teacher's role "in conveying the Church's message and carrying out its mission" was important, as was her title of "minister." *Id.* at 2062 (citing *Hosanna-Tabor*, 565 U.S. at 192). Further, to be awarded that title, she had to satisfy significant academic requirements. *Id.* (citing *Hosanna-Tabor*, 565 U.S. at 191). But in *Guadalupe*, the Supreme Court explained its consideration of those factors in *Hosanna-Tabor* "did not mean that they must be met—or even that they are necessarily important—in all other cases." *Id.* at 2063; *see also Hosanna-Tabor*, 565 U.S. at 190 (The Supreme Court has declined "to adopt a rigid formula for deciding when an employee qualifies as a minister," but has explained the exception "is not limited to the head of a religious congregation"); *Puri v. Khalsa,* 844 F.3d 1152, 1159 (9th Cir. 2017) ("neither the Supreme Court nor this court has ever expressly limited the ministerial exception to particular types of positions"). So, while giving an employee the title of minister is not enough on its own to satisfy the ministerial exception, it is also not a necessary requirement. *Guadalupe*, 140 S. Ct. at 2063. "Requiring the use of the title would constitute impermissible discrimination, and this problem cannot be solved simply by including positions that are thought to be the counterparts of a 'minister,' such as priests, nuns, rabbis, and imams." *Id.* at 2064. Similarly, "the academic requirements of a position may show that the church in question regards the position as having an important responsibility in elucidating or teaching the tenets of the faith. . . . But insisting in every case on rigid academic requirements could have a distorting effect." *Id.* "[T]hese circumstances, while instructive in *Hosanna-Tabor*, are not inflexible requirements and may have far less significance in some cases." *Id.*

Instead, the Supreme Court has commanded that "[w]hat matters, at bottom, is what an employee does." *Id.* In *Hosanna-Tabor* and *Guadalupe*, what mattered "was the recognition that educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* In light of that understanding, the Supreme Court concluded the teachers in *Guadalupe* "performed vital religious duties." *Id.* at 2066.

> Educating and forming students in the Catholic faith lay at the core of the mission of the schools where they taught, and their employment agreements and faculty handbooks specified in no uncertain terms that they were expected to help the schools carry out this mission and that their work would be evaluated to ensure that they were fulfilling that responsibility. . . . And both their schools expressly saw them as playing a vital part in carrying out the mission of the church, and the schools' definition and explanation of their roles is important. . . . A religious institution's explanation of the role of such employees in the life of the religion in question is important.

*Id.*

The ministerial exception is an affirmative defense and SF Zen Center's burden to prove. *Hosanna-Tabor*, 565 U.S. at 195 n.4. As the party bearing that burden at trial, to prevail on its summary judgment motion SF Zen Center "must affirmatively demonstrate that no reasonable trier of fact could find other than for" it, *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007), "such that every element of [the defense] must be resolved in [its] favor as a matter of law based on undisputed evidence," *Terraza v. Safeway Inc.*, No. 16-CV-03994-JST, 2019 WL 12872959, at *3 (N.D. Cal. Mar. 27, 2019) (cleaned up).

**II.     Analysis**

Mr. Behrend does not dispute SF Zen Center is a religious organization. (Dkt. No. 67 at 4 n.1.) The question is whether Mr. Behrend falls within the First Amendment Religion Clauses exception. Drawing all reasonable inferences in Mr. Behrend's favor, the totality of the undisputed facts compel the conclusion that the First Amendment bars application of the discrimination laws to Mr. Behrend's position at SF Zen Center.

Mr. Behrend's title was Work Practice Apprentice, and he held himself out as a Work Practice Apprentice. And, at SF Zen Center he acted as a Work Practice Apprentice—fulfilling both the formal practice and work practice requirements. These facts are undisputed. It is also undisputed that as a participant in the Work Practice Apprentice program he was practicing and training in Soto Zen Buddhism. Indeed, the record compels a finding that nearly all of his time at the Center involved the practice of Soto Zen Buddhism. *See Hosanna-Tabor*, 565 U.S. at 194 (noting "[t]he amount of time an employee spends on particular activities is relevant in assessing that employee's status, but that factor cannot be considered in isolation," and concluding ministerial exception applied to employee whose "religious duties consumed only 45 minutes of

8

1 each workday").

2       Mr. Behrend's focus on his work responsibilities does not change the analysis. There is no
3 genuine dispute that Mr. Behrend's work practice time was religious in nature. The undisputed
4 record shows SF Zen Center considers work practice an integral part of Soto Zen Buddhism
5 training. It considers all of a Work Practice Apprentice's work practice time an expression and
6 practice of faith—not merely the ceremonial opening activities and bowing and chanting
7 throughout the day, but all the work duties in between. *See Guadalupe*, 140 S. Ct. at 2066 ("A
8 religious institution's explanation of the role of such employees in the life of the religion in
9 question is important."). Evidence that work practice took precedence over formal practice
10 activities does not create a material dispute, because SF Zen Center considers work practice an
11 equal expression of faith as formal practice. Likewise, evidence that some Work Practice
12 Apprentices took the Shingi less seriously than others or talked inappropriately during work
13 practice does not create a genuine dispute that they were involved in a religious training program.
14 *See Hosanna-Tabor*, 565 U.S. at 193 (noting it is "surely relevant" that "a recognized religious
15 mission underlie[s] the description of the employee's position"); *Markel v. Union of Orthodox*
16 *Jewish Congregations of Am.*, No. 2:19-CV-10704-JWH-SK, 2023 WL 1093676, at *8 (C.D. Cal.
17 Jan. 3, 2023) ("As *mashgiach*, [Plaintiff] was integral to the koshering of wine for use by
18 Orthodox Jews and the greater Jewish community, and his efforts were necessary in fulfilling an
19 important function of the Jewish faith.").

20       Mr. Behrend's evidence that he neither held a leadership role at SF Zen Center nor was on
21 a path to attain one does not alter the result. The question of religious leadership has featured
22 prominently in recent ministerial exception cases, which tend to involve a teacher or comparable
23 employee at a religious school. *See Guadalupe*, 140 S. Ct. at 2056–59 (elementary school lay
24 teachers); *Hosanna-Tabor*, 565 U.S. at 177–78 ("called" teacher); *Palmer v. Liberty Univ., Inc.*,
25 No. 6:20-CV-31, 2021 WL 6201273, at *3–4 (W.D. Va. Dec. 1, 2021) (Professor of Art), *appeal*
26 *docketed*, No. 21-2434 (4th Cir. Dec. 29, 2021); *Ostrander v. St. Columba Sch.*, No. 3:21-CV-
27 00175-W-LL, 2021 WL 3054877, at *1 (S.D. Cal. July 20, 2021) (preschool teacher); *Starkey v.*
28 *Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195, 1199–1200 (S.D. Ind.

9

2020) (guidance counselor); *Tucker v. Faith Bible Chapel Int'l*, No. 19-CV-01652-RBJ, 2020 WL 2526798, at *1–5 (D. Colo. May 18, 2020) (science teacher, Director of Student Life, Chaplain); *Richardson v. Nw. Christian Univ.*, 242 F. Supp. 3d 1132, 1145 (D. Or. 2017) (Assistant Professor of Exercise Science); *DeWeese-Boyd v. Gordon Coll.*, 487 Mass. 31, 34–41 (2021) (Associate Professor of Social Work), *cert. denied*, 142 S. Ct. 952 (2022); *see also Skrzypczak v. Roman Cath. Diocese of Tulsa*, 611 F.3d 1238, 1243–44 (10th Cir. 2010) (Director of Diocese's Department of Religious Formation, who supervised and taught at Pastoral Studies Institute). Teaching is a position of leadership with respect to that teacher's students, and the Supreme Court has concluded that if such leadership is religious in nature, it reflects a role in carrying out the religious school's mission. *See Guadalupe*, 140 S. Ct. at 2064 ("[E]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school."); *id.* at 2066 (noting "the close connection that religious institutions draw between their central purpose and educating the young in the faith"). Other cases have involved employees "actively in the process of becoming ordained ministers," and thus on a path to religious leadership. *Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 627 F.3d 1288, 1292 (9th Cir. 2010) (en banc).

But the ministerial exception does not "appl[y] only to leaders" of the faith. *Guadalupe*, 140 S. Ct. at 2067 n.26 (cleaned up). Courts must "take all relevant circumstances into account" and "determine whether each particular position implicate[s] the fundamental purpose of the exception." *Id.* at 2067; *see id.* at 2064 ("[T]hese . . . are not inflexible requirements and may have far less significance in some cases."); *see Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring) ("The term 'minister' is commonly used by many Protestant denominations to refer to members of their clergy, but the term is rarely if ever used in this way by Catholics, Jews, Muslims, Hindus, or Buddhists. . . . [I]t would be a mistake if the term 'minister' or the concept of ordination were viewed as central to the important issue of religious autonomy that is presented in cases like this one. Instead, courts should focus on the function performed by persons who work for religious bodies.").

Every reasonable trier of fact would be compelled to find training in the practice of Soto

Zen Buddhism, both the formal practice and the work practice, "lie[s] at the very core of the mission of" SF Zen Center. *Guadalupe*, 140 S. Ct. at 2064. And so, drawing all reasonable inferences in Mr. Behrend's favor, every reasonable trier of fact would be compelled to find his position implicates the fundamental purpose of the ministerial exception. The Work Practice Apprentice position was undisputedly a residential religious training program, and work practice was undisputedly a part of that religious training. Work as part of learning to practice the faith and work as part of training to lead the faith implicate the same fundamental purpose of the exception. *See id.* at 2060 (describing purpose of protecting a religious institution's "autonomy with respect to internal management decisions that are essential to the institution's central mission"); *see also Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 309 (4th Cir. 2004) ("[Plaintiff] supervised and participated in religious ritual and worship. . . . [He] arguably lacked independent authority to make some decisions regarding food preparation, but there is no requirement that an individual have the final say on spiritual matters." (cleaned up)). Therefore, the ministerial exception protects SF Zen Center's autonomy in deciding what kinds of work practice are proper training in the faith.

Mr. Behrend's reliance on the declaration of Seigen Johnson does not create a genuine dispute as to whether Mr. Behrend trained and practiced in Soto Zen Buddhism as a Work Practice Apprentice. Her after-the-fact opinion that she had been part of the Work Practice Apprentice program and as part of that program did not receive any religious training is not relevant to Mr. Behrend's experience, or more precisely, SF Zen Center's view of Mr. Behrend's position. Further, her declaration actually supports the finding that the Mr. Behrend resided at SF Zen Center to practice and train in Soto Zen Buddhism. She observes SF Zen Center refers to residents as "monks," but that "several residents" would not refer to themselves as monks "because that would imply a stronger relationship to practice than they actually had." (Dkt. No. 67-4 at ¶ 3.) Ms. Johnson's testimony confirms residents were practicing Soto Zen Buddhism, some more seriously than others.

The Court's conclusion that Mr. Behrend resided at SF Center to practice and train in Soto Zen Buddhism is distinguishable from cases reasoning that an employee's own practice of the

faith does not establish religious training or leadership. *See Palmer*, 2021 WL 6201273, at *6 ("The Court does not credit Liberty's argument that Palmer's personal religious devotion and experience somehow constitutes 'informal qualification' as a minister. The controlling cases clearly indicate that what is important is formal religious training in preparation for a ministerial role, not personal devotion."); *DeWeese-Boyd*, 487 Mass. at 51 n.22 ("DeWeese-Boyd has made several statements concerning the importance of her faith to her life and how it motivates her personal choices, including her choice of profession and the manner in which she practices it. . . . [W]e cannot, as the defendants suggest, rely on her professions as evidence that DeWeese-Boyd was a minister. Her personal statements of faith are not equivalent to expressly holding herself out as a minister, as Perich did in *Hosanna-Tabor*; as the defendants themselves testified, being a Christian and being a ministerial employee are not the same."); *see also Guadalupe*, 140 S. Ct. at 2068 ("Respondents go further astray in suggesting that an employee can never come within the *Hosanna-Tabor* exception unless the employee is a 'practicing' member of the religion with which the employer is associated."). Here, the Court's analysis is based on the importance of residential practice and training of Soto Zen Buddhism, including work practice, to SF Zen Center and not the importance of practicing Soto Zen Buddhism to Mr. Behrend in particular. The Court does not conclude Mr. Behrend's practice of the faith qualified him as a leader. Rather, it concludes the undisputed importance of practicing and training in Soto Zen Buddhism to SF Zen Center implicates the fundamental purpose of the ministerial exception.

Mr. Behrend insists that applying the First Amendment here is at the outer edges (indeed, beyond the outer edges) of the ministerial exception. The Court disagrees. To the contrary, the undisputed facts are closer to prohibited interference in a religious institution's matters of faith and doctrine than those involving the teachers in *Hosanna-Tabor* and *Guadalupe*. To illustrate, consider what Mr. Behrend is asking a court or jury to do: rule, in effect, that SF Zen Center must allow him to continue to practice and train in Soto Zen Buddhism as a resident at the Center. It is difficult to imagine a more direct interference with a religious institution's constitutional right to decide matters of faith and doctrine than commanding it to continue to house and train a particular person in the practice of the faith.

* * *

SF Zen Center has met its burden to establish the ministerial exception applies as a matter of law. *See Hosanna-Tabor*, 565 U.S. at 195 n.4; *Soremekun*, 509 F.3d at 984. Accordingly, SF Zen Center is entitled to judgment as a matter of law.

## CONCLUSION

SF Zen Center's motion is GRANTED.

This Order disposes of Docket No. 63.

**IT IS SO ORDERED.**

Dated: February 14, 2023

JACQUELINE SCOTT CORLEY
United States District Judge

13